Justice Indeglia,
dissenting.
Although I agree with the thrust of the Chief Justice’s dissent, I write separately to address points that I find worthy of .additional discussion. Indeed, “[o]ne can imagine few more sympathetic litigants than * * * a ‘Good Samaritan’ who stopped his [or her] car * * * to help a stranded motorist. * * * It is natural to sympathize with a litigant who has suffered harm caused by someone who cannot pay the consequences. But if sympathy were a rule of contract construction, there would soon be no law of contracts left.”[1] While I understand that in deciding this particular case, the majority may have been moved by sympathy for the plaintiff, who sus *1163 tained injuries while offering aid to another, I am nevertheless convinced that it has extended our jurisprudence well beyond our prior holdings and those of other jurisdictions on the meaning of “occupying”; and, thus, I feel obliged to dissent.
With all due respect to the majority, I cannot fathom that plaintiff in this case was occupying the insured vehicle such that she was entitled to UM coverage. Beyond the majority’s ultimate conclusion, I take particular issue with its analysis of the first and third prongs of the standard articulated in General Accident Insurance Co. of America v. Olivier, 574 A.2d 1240 (R.I. 1990), and its use of G.L. 1956 § 11-56-1[2] to conclude that the fourth prong was met.
As an initial matter, I diverge from the broad lens through which the majority views the Olivier factors. I have not come across a single ease that corroborates the majority’s declaration that “the general purpose underpinning the four [Olivier] factors” is “to extend coverage broadly.”[3] Instead, it appears that the majority conflates the idea that we broadly interpret the term “occupying” vis-á-vis a passenger in an insured vehicle [4] with the conclusion that we sweepingly interpret each individual prong of the Olivier test. This logical leap is troubling; and, because the starting point from which the majority broadly analyzes each factor is defective, what follows is equally unsound. In my view, instead of analyzing each factor broadly, the majority largely overrides the Olivier test altogether with an approach that seeks to simply reward a “Good Samaritan” by “extend[ing] coverage broadly.”
I am moreover convinced that, although well-intentioned, the majority’s attempt to clarify the law in this arena only further muddied the water for future litigants. The trial justice interpreted Olivier to require that each prong be met for plaintiff to recover; however, the majority’s opinion fails to clarify what our law requires to satisfy the Olivier test. The majority’s declaration that “a plaintiff may fail to satisfy a portion of the Olivier criteria, but may nonetheless be ‘occupying’ an insured vehicle for purposes of UM coverage” is equivocal at best and only adds confusion to an otherwise murky legal standard. Indeed, the majority’s opinion leaves litigants un *1164 certain about whether it is necessary to satisfy each Olivier prong to fulfill its standard.
Additionally, I deem problematic the majority’s analysis of Olivier’s first prong. Application of the majority’s reasoning makes it difficult to envision a circumstance that could not meet the liberal “some nexus” standard for “a causal relation or connection between the injury and the use of the insured vehicle.” Therefore, based on its nearly limitless scope, I am convinced that it is time to reconsider the broad “some nexus” test that this Court adopted in Olivier, citing to Government Employees Insurance Co. v. Novak, 453 So.2d 1116 (Fla. 1984). Novak did not involve UM coverage; rather, it involved personal injury protection (PIP) insurance. Id. at 1117. Notably, when given occasion to apply the broader “some nexus” standard to cases involving UM insurance, that very same court explicitly, and in my opinion correctly, declined to do so. See Race v. Nationwide Mutual Fire Insurance Co., 542 So.2d 347, 348-49 (Fla. 1989) (“However, we are unwilling to apply the liberal PIP interpretation of nexus to claims for UM benefits.”).[5] Therefore, I believe that the trial justice’s use of a “but for” standard when analyzing the first prong, although not this jurisdiction’s law, was more appropriate because this Court should have never extended the broader “some nexus” test to the UM context in the first instance.[6]
The majority’s conclusion that the circumstances of this case satisfy the first prong, to me lowers the bar so much that it is hard to imagine a scenario where a causal connection would not be found. As such, I would have affirmed the trial justice’s finding in this respect. See, e.g., Gilbertson v. State Farm Mutual Auto Ins., 845 F.2d 245, 248 (10th Cir. 1988) (“The mere fact that the use of the vehicle preceded the accident is not sufficient to establish the causal connection. * * * There is hardly any activity in our society which is not preceded by the use of an automobile.”); Ulrich v. United Services Automobile Association, 839 P.2d 942, 949 (Wyo. 1992) (“[Bjecause the use of an automobile has ‘some nexus’ to almost any action undertaken in society, it is our persuasion that the test does not accurately reflect the intent of the parties regarding the scope of UM coverage.”).
I also deviate from the majority’s analysis of the third prong. It relies, in part, on Lynn v. Westport Insurance Corp., 258 Fed.Appx. 438, 442 (3d Cir. 2007), an opinion in which the Third Circuit Court of Appeals held that a person is “vehicle oriented” if that person “had been in the vehicle, had something occur which required them to exit the vehicle for a brief time before they could continue their journey, had full intention of returning to their vehicle, and were struck by another vehicle while performing the action that would allow them to continue their journey.” The majority then adopts this reasoning for determining whether a person is vehicle oriented.
To fit plaintiff within this criterion and conclude that she was vehicle oriented, the majority holds that “plaintiffs departure *1165 from the insured vehicle was incident to a temporary interruption in an otherwise unfinished excursion into the Amazing Super Store and that, upon completion of the occurrence causing the interruption, plaintiff intended to resume her journey.” This conclusion, however, is not grounded in the facts, and it is a stretch to conclude that plaintiff interrupted her travel to assist the victim and “had full intention” to return to the vehicle. See Lynn, 258 Fed.Appx. at 442. The plaintiff was not en route to her destination (the Amazing Super Store) when her travel was interrupted by her rescue attempt. Rather, she had already arrived at the store and was merely waiting idly in the vehicle before entering. The only remaining leg of her journey was from the parked vehicle into the Amazing Super Store, and such a journey was pedestrian, not vehicular. As a result, rather than return to her vehicle, plaintiff could access what awaited her in the Amazing Super Store by foot.
In analyzing the fourth prong of the Olivier test, the majority relies on § 11-56-1. Specifically, it maintains that “in light of § 11-56-1, a willingness to render aid at the scene of a motor vehicle collision as a Good Samaritan, is inherently part of the use of a motor vehicle in this state.” In this respect, the majority also states that “[although we have yet to address the affirmative duty imposed upon motorists under § 11-56-1, we are not called upon to do so at this time.” Yet, it appears that ultimately it has done just that in concluding that § 11-56-1 was a declaration of public policy to encourage the rescue of others from perilous situations. This statute, which to me is replete with vagueness, does not even mention motor vehicles. True, it may apply in the automobile accident setting, but it is just as applicable to a pedestrian finding someone lying in a pool of blood at the bus stop in Kennedy Plaza.
Also with respect to the fourth prong, I question the majority’s reliance on Butzberger v. Foster, 151 Wash.2d 396, 89 P.3d 689, 697 (2004) (en banc), in which the Supreme Court of Washington held that “a rescue effort to assist an occupant of another vehicle is a transaction essential to the use of that vehicle.” While the majority cites to Butzberger for that proposition, it fails to note that the Supreme Court of Washington narrowly confined this holding to “when a motorist interrupts his or her travel to rescue a victim in another vehicle * * Id. at 698 (emphasis added). Hence, the conclusion in Butzberger was based on the fact that'Butzberger intended to proceed in his vehicle and continue his travel after concluding his rescue effort.[7] Id. at 697-98.
As noted above, I am perplexed at how the majority could maintain that plaintiff interrupted her travel to assist the victim. Unlike those cases where the injured party was in a vehicle involved in an accident or came upon the accident, like Butzberger, here plaintiff and the vehicle she was in was off the road in a parking lot for one to two minutes intending to go into the Amazing Super Store when she heard the collision. The plaintiff had already arrived at her destination and was sitting in the parked vehicle before the accident. This is a critical distinction that the Butzberger court relied, on to distinguish United States Fire Insurance Co. v. Parker, 250 Va. 374, 463 S.E.2d 464, 466 (1995), in which the Supreme Court of Virginia held that Parker was not engaged in a transaction essential to the use of the vehicle. The Butzberger court noted that, while both *1166 Parker and Butzberger used their vehicles as a means of transportation to work, “Butzberger was struck and killed while still in the process of driving to work,” whereas “Parker on the other hand had already arrived at her jobsite, parked the insured truck, and was working when she sustained her injuries * * Butzberger, 89 P.3d at 698 n.6. Accordingly, in this “intensely fact-driven” inquiry, Butzberger acknowledged the significant distinction between a person en route to his or her destination who is interrupted before arriving there and one who already arrived at the destination and parked the vehicle, like plaintiff. Because plaintiff fell into the latter category, I am further convinced that she was not engaged in a transaction essential to the use of the vehicle.
Consequently, this case calls to mind the sound guidance of Sir William Blackstone that “the liberty of considering all cases in an equitable light must not be indulged too far, lest thereby we destroy all law[.] * * * And law, without equity, though hard and disagreeable, is much more desirable for the public good than equity without law * * [8] Although I recognize the plaintiffs praiseworthy deed in coming to the aid of a person in distress, I am ultimately persuaded that the following language cited by the trial justice in her decision should have carried the day: this Court “is not at liberty to create bad law to cover good persons. If the Court were to do so, it would right one wrong, [the plaintiffs] injury, while creating another: holding [the defendant] responsible even when the law said otherwise.”[9] For these reasons, I must respectfully dissent.

. United States Fidelity and Guaranty Co. v. Goudeau, 272 S.W.3d 603, 605 (Tex. 2008).

.As an aside, I find misleading the majority's characterization of G.L. 1956 § 11-56-1 as a “Good Samaritan” statute. The statute is entitled "Duty to assist,” and unlike "Good Samaritan” statutes that immunize persons from liability for voluntarily and gratuitously rendering aid, § 11-56-1 imposes criminal liability for the failure to render assistance in certain circumstances. Thus, despite the majority’s repeated references to § 11-56-1 as a "Good Samaritan” statute, this is a misnomer. See Dan B. Dobbs et al., The Law of Torts § 405 n,25 (2d ed. 2016) ("While some label these 'good Samaritan’ statutes, they are more properly called 'bad Samaritan’ statutes. ‘Good Samaritan' statutes immunize from negligence liability those defendants who do assist a plaintiff in distress * * * [whereas bad Samaritan statutes] place a defendant under some form of legal duty to assist and provide for criminal or civil liability for non-assistance.”).

. To be certain, the one case that the majority cites for this proposition comes up short, Beyond the language cited not verifying this assertion, the case cited, General Accident Insurance Co. of America v. D'Alessandro, 671 A.2d 1233, 1235 (R.I. 1996), actually cuts against the majority's claim because there the Court held that the defendant was not "occupying” her uninsured vehicle. Id.

. “[T]his Court accorded a broad and liberal interpretation to the term 'occupying' as it related to a passenger in an insured vehicle ⅜ * *•” Jackson v. Quincy Mutual Fire Insurance Co., 159 A.3d 610, 614 (R.I. 2017) (describing this Court's holding in General Accident Insurance Co. of America v. Olivier, 574 A.2d 1240, 1243 (R.I. 1990) (emphasis added)).

. Curiously, in adopting the "some nexus" standard from the Florida Supreme Court in Olivier, this Court did not acknowledge Race v. Nationwide Mutual Fire Insurance Co., 542 So.2d 347 (Fla. 1989) and its adverse holding, which that same court handed down just one year before this Court decided Olivier.

. We find additional support for the "but for” test in Butzberger v. Foster, 151 Wash.2d 396, 89 P.3d 689, 694 (2004) (en banc)—a case that is heavily cited by the majority with respect to the fourth prong but is notably absent from the majority’s discussion of the first prong.

. Although I agree with the majority’s averment that whether an individual is "occupying” for these purposes is "intensely fact-driven,”'it appears that the majority ’ has failed to heed its own advice.

. 1 William Blackstone, Commentaries *62.

. Greenwich Insurance Co. v. Hall, Civil No. 11-66-ART, 2012 WL 5868915, at *3 (E.D. Ky. Nov. 20, 2012).